# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Burman*, 2013 IL App (2d) 110807

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROCK J. BURMAN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0807 |
| Filed | March 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated criminal sexual abuse was upheld over his contentions that the prosecutor improperly discussed abducted and missing children, implied that the evidence of touching proved that he acted with the "intent to arouse," and explained reasonable doubt, and that the trial court barred access to the courtroom, since none of the prosecutor's comments or arguments were erroneous, and the order limiting access to the courtroom while one child testified never actually took effect because no person sought to enter during that time and, therefore, no prejudice occurred. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 10-CF-449; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Affirmed as modified. |

| Counsel on Appeal | Thomas A. Lilien and Linda A. Johnson, both of State Appellate Defender's Office, of Elgin, for appellant. |
| | |
| | Louis A. Bianchi, State's Attorney, of Woodstock (Lawrence M. Bauer and Matthew J. Schmidt, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion. |
| | Justices McLaren and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury found defendant, Rock J. Burman, guilty of two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2010)), and the trial court sentenced defendant to 2 years' probation and 180 days in jail. The court also imposed a $2,500 fine. Defendant committed the offenses against two young boys in his swim class.

¶ 2    On appeal, defendant argues that he is entitled to a new trial or a credit against his fine. First, defendant argues that the prosecutor made improper rebuttal argument in that she (1) tried to incite fear in the jury by discussing abducted and missing children, (2) misstated the law by implying that evidence of touching necessarily proved that defendant acted with the "intent to arouse," and (3) explained the concept of proof beyond a reasonable doubt. Second, defendant contends that he was denied his right to a public trial when the trial court barred access to the courtroom. Third, defendant asserts that he is entitled to a $5-per-day credit for the time spent in presentence custody. We modify the mittimus to reflect the *per diem* credit but otherwise affirm the convictions.

¶ 3    FACTS

¶ 4    Defendant was charged with two counts of aggravated criminal sexual abuse in that he placed his hand on the penises of two victims. A person commits aggravated criminal sexual abuse if he is 17 years of age or over and commits an act of sexual conduct with a victim who is under 13 years of age. 720 ILCS 5/12-16(c)(1)(i) (West 2010). Count I alleged that defendant committed the offense on March 2, 2010, against M.O. Count II alleged that defendant committed the offense on March 10, 2010, against J.M. Defendant was taken into custody on May 3, 2010, and released on bond on May 11, 2010.

¶ 5    Before trial, the State moved for closure of the courtroom during the testimony of M.O. and J.M. See 725 ILCS 5/115-11 (West 2010). The motion asserted that allowing the minors

to testify in a closed courtroom would minimize their trauma from testifying. Defendant opposed the motion, arguing that closure would deprive him of a fair trial because members and employees of Centegra Health Bridge, where the sexual conduct allegedly occurred, and defendant's family and friends would not be allowed into the proceedings. Defendant further argued that closure could cause the jurors to emphasize the minors' testimony. The trial court reserved ruling on the motion until trial.

¶ 6    At trial, Detective Brett Nystrom of the Crystal Lake police department testified that, on March 16, 2010, Jennifer M., the mother of J.M., came to the police station to speak with him. Detective Nystrom arranged for Lindsay Porth, a forensic interviewer, to conduct a video-recorded interview of J.M. at the Child Advocacy Center (CAC) four days later.

¶ 7    On April 1, 2010, Detective Nystrom obtained from Centegra Health Bridge a list of defendant's swimming students, and he called their parents. Angela O. was one of the parents called, and she said that her son, M.O., was a victim of defendant. Detective Nystrom arranged for Anna Krause to conduct a video-recorded interview of M.O. at the CAC. Detective Nystrom also testified that the Centegra Health Bridge pool has video cameras.

¶ 8    Following Detective Nystrom's testimony, the prosecution told the trial judge that "the child" would be the next witness, and the judge sent out the jury. The judge asked the spectators in the courtroom about their interest in the case. The judge identified an attorney representing the family of M.O., an attorney representing Centegra Health Bridge, M.O.'s father, a CAC representative, and an attorney unconnected to the case. Without objection, the judge allowed all to remain. The State requested that "movement be restricted just while the victim is on the stand so there's no distraction." The judge instructed the bailiff to close the door and deny entry to everyone while the minor testified. The jurors returned but were not given any explanation for their temporary removal or the changes to the courtroom.

¶ 9    J.M., age nine, testified that he and his older sister Kaylee had taken swimming lessons from defendant at Centegra Health Bridge. On March 10, 2010, J.M., Kaylee, and a girl named Samantha had a group lesson. Matthew M., J.M.'s father, took his children to the pool that evening. While J.M. was practicing the backstroke, defendant put his hand into J.M.'s swim trunks numerous times and touched his "privacy" as J.M. swam back and forth. J.M. did not react to the touching in any way. When the lesson ended, J.M. and his sister got out of the pool. Once J.M. and Matthew were in the locker room, J.M. said that defendant had touched his "privates." Matthew responded that he would "talk to Mom about that," and they went home. J.M. recalled going to the CAC and talking to Porth. The video recording of the interview was published to the jury and then the trial court recessed for the day.

¶ 10   The record does not suggest that the trial judge closed the courtroom the next day, as the transcript does not mention closure. The court began the proceedings by disposing of some evidentiary motions, after which Matthew testified about taking his children to Centegra Health Bridge.

¶ 11   Matthew testified that, on the date of the incident, four children, including J.M., were in the class. Matthew was seated in the pool area, where the pool was well lit and had clear water. He checked his email and played games on his mobile device and sometimes watched the children swim. Matthew left the pool area for 15 minutes to use the bathroom and to go

to his car. J.M. reported that defendant had touched his privates, and Matthew took the children home.

¶ 12      Jennifer testified that she usually took her children to their swimming lessons. J.M. wore tight trunks, "like the sleek ones for fast swimming." Jennifer went to the police station with her sister's husband, who is a lawyer. On March 22, 2010, Jennifer and Matthew took J.M. to the CAC.

¶ 13      Sam G., age 11, testified that he had taken swimming lessons from defendant at Centegra Health Bridge. Sam noticed that defendant sometimes touched a blonde kid with a short haircut and carried him around in the water.

¶ 14      Angela testified that, after she spoke on the phone with Detective Nystrom, she asked M.O. if defendant ever touched him inappropriately. M.O. said "yes" and indicated his genitals and buttocks.

¶ 15      M.O., age 10, testified that he had taken swimming lessons from defendant while Angela sat next to the pool. During most lessons, defendant touched M.O.'s penis while M.O. was practicing different strokes. The day before he testified, M.O. watched his video-recorded interview. The video was published to the jury. The transcript contains no reference to closure before or after M.O.'s testimony.

¶ 16      Justin Keating, a lifeguard and swim instructor at Centegra Health Bridge, testified for defendant. Keating served as the lifeguard for swimming lessons on March 2, 2010. Keating described the pool as very well lit and said that he did not see anything unusual. Another swim instructor, Sharon Kovar, testified that she too was in the pool area that day. Kovar gave half-hour lessons to two sisters, while defendant taught M.O. Kovar saw nothing unusual, and she specifically recalled watching defendant to see how he taught the breaststroke. A third swim instructor, Nancy Leibforth, testified that she was at Centegra Health Bridge every day in February and March 2010. Leibforth explained that sometimes she touched the children she was teaching, which could result in an accidental touch in an inappropriate place. Leibforth never saw anything inappropriate in defendant's classes.

¶ 17      Porth testified to her procedures in questioning children who claim abuse. Detective Nystrom testified that he tried to speak with Kaylee, but her parents refused the request.

¶ 18      Nina Stasinopoulos testified that defendant gave her child private and group swimming lessons in March 2010. Stasinopoulos sat at the pool deck during the lessons and never saw anything unusual.

¶ 19      In closing argument, the State recounted its evidence and commented on the witnesses' testimony. The defense responded that the case was based entirely on the words of children and that J.M. was influenced by his mother's questions. The defense argued that the offenses did not occur, because no one witnessed them.

¶ 20      In rebuttal, the prosecution made the following argument to the jury:

> "Things happen every day. We don't always see everything that happens. Kids disappear in front of their own parents at the park. Kids are taken. Kids are touched.
>
> * * *
>
> Use your common sense. Just because those parents didn't see the defendant put his

hand on their penis [*sic*], does not mean that it didn't happen."

¶ 21 The trial court overruled defense counsel's objection to the remarks. The prosecution also stated that it had the burden to prove defendant guilty beyond a reasonable doubt. The prosecution concluded by adding, "Beyond a reasonable doubt. That is our burden. It's a burden we embrace. However, it's not beyond all doubt. It's not beyond an unreasonable doubt. It's thoroughly reasonable to infer that when the defendant put his hand on [the minors' penises], that it was his intent to sexually gratify himself."

¶ 22 Following the guilty verdict, defendant filed a posttrial motion, challenging, *inter alia*, the prosecution's comment in rebuttal argument about kids disappearing. The trial court denied the motion. Defendant was certified and ordered to register as a sex offender and sentenced to serve 2 years' probation and 180 days in jail, with 120 days stayed. The court also imposed a $2,500 fine. This timely appeal followed.

¶ 23                                   ANALYSIS
¶ 24                          A. Prosecutorial Misconduct
¶ 25 Defendant argues that he is entitled to a new trial, based on three improper comments made by the prosecution during rebuttal argument. It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite response, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). In reviewing whether comments made during closing argument are proper, we must review the closing argument in its entirety and view remarks in context. *Kitchen*, 159 Ill. 2d at 38.

¶ 26 We recognize that our appellate courts are divided on the standard of review for closing remarks. *People v. Maldonado*, 402 Ill. App. 3d 411, 421 (2010). The confusion stems from two supreme court cases. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the supreme court held that whether a prosecutor's remarks are so egregious as to require a new trial presents a question of law, which is reviewed *de novo*. However, the *Wheeler* court also cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), wherein the court applied the abuse-of-discretion standard to review a prosecutor's remarks during closing argument. *Wheeler*, 226 Ill. 2d at 121. Where the result would be the same regardless of the standard applied, the appellate court has noted the conflict but has declined to determine the appropriate standard of review. See *Maldonado*, 402 Ill. App. 3d at 422; *People v. Anderson*, 407 Ill. App. 3d 662, 676 (2011). Because we would reach the same result under either standard in this case, we refrain from discussing the applicable standard until our supreme court resolves the conflict. See *Anderson*, 407 Ill. App. 3d at 676.

¶ 27                              1. "Kids disappear"
¶ 28 First, defendant objects to the comment that "[k]ids disappear in front of their own

-5-

parents at the park. Kids are taken." Defendant argues that the comment is reversible error because the jury had heard no evidence of children being taken from their parents or of the disappearance of children in front of their parents while in parks. Defendant concludes that the only purpose of the comment was to improperly inflame the passions of jurors and distract them from the evidence. We disagree.

¶ 29 The prosecution never implied that defendant was a child abductor. Instead, the prosecution's comment about children disappearing was a direct response to defendant's closing argument that the State had failed to produce an eyewitness to the crimes and that in the absence of such evidence, the jury must find defendant not guilty. The prosecution was exercising its wide latitude in arguing that bad things frequently happen to children right in front of their parents, without the parents or anyone else noticing. After reading the closing argument in its entirety, we conclude that the comment was a reasonable invited response to defendant's argument that, because the pool area was well-lit, Matthew did not witness defendant touching J.M., and Angela did not witness defendant touching M.O., the offenses did not occur. Furthermore, the trial court appropriately instructed the jury that closing argument is not evidence. The court also told the jury to disregard any argument not based on the evidence. We conclude that the prosecution's comment about kids disappearing was not error and that therefore the trial court did not err in overruling defendant's objection to it.

¶ 30          2. "Sexual gratification"

¶ 31 Second, defendant challenges the prosecution's argument that defendant's conduct of placing his hand on the boys' penises could be done for "no other purpose" except to sexually gratify himself. The prosecution argues that "[i]t's thoroughly reasonable to infer that when the defendant put his hand on [the minors' penises], that it was his intent to sexually gratify himself."

¶ 32 The State argues, and defendant concedes, that he did not object at trial to the prosecution's comment about sexual gratification or raise the issue in his posttrial motion. To preserve an issue for review on appeal, a defendant must object to the error at trial and include the objection in a posttrial motion. *People v. Basler*, 193 Ill. 2d 545, 549 (2000). We agree with the parties that defendant has forfeited consideration of the issue on appeal. Defendant thus asks us to review this claim under the plain-error doctrine.

¶ 33 The plain-error doctrine allows a reviewing court to consider an unpreserved error when either: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in assessing whether the plain-error doctrine applies is to determine whether any error has occurred in the first place. *Piatkowski*, 225 Ill. 2d at 565.

¶ 34 Defendant concludes that the statement about sexual gratification was not a fair comment on the evidence but was an incorrect statement of the law, made for the purpose of

eliminating, or at least reducing, the jury's perception of the State's burden of proving every element. We disagree.

¶ 35    To sustain each charge, the State was required to prove that defendant committed an act of "sexual conduct" against the victim. See 720 ILCS 5/12-16(c)(1)(i) (West 2010). Sexual conduct is "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12-12(e) (West 2010).

¶ 36    Intent to arouse or to satisfy sexual desires can be shown by circumstantial evidence, which the trier of fact may consider in inferring the defendant's intent from his conduct. *In re D.H.*, 381 Ill. App. 3d 737, 741 (2008). The issue of whether an accused intended sexual gratification must be determined on a case-by-case basis, but when the accused is an adult, a fact finder can infer that the accused intended sexual gratification. *D.H.*, 381 Ill. App. 3d at 741.

¶ 37    The prosecution's additional remarks on sexual gratification add context:

"The Defendant's intent to arouse or gratify himself sexually can be inferred from solely the nature of the act. By putting his hand on their penis [*sic*], that is a sexual act. Use your common sense. There is no other reason that a grown man puts his hand on a child's penis.

The Defendant didn't inadvertently, accidentally, maybe for medical purposes touch [J.M.] or [M.O.] His intentions were clear and unmistakably for sexual gratification of himself. Under the circumstances they could have no other purpose.

* * *

It's thoroughly reasonable to infer that when the Defendant put his hand on [the minors' penises], that it was his intent to sexually gratify himself, and we ask that you find him guilty on both counts of aggravated criminal sexual abuse."

¶ 38    These remarks show that the prosecution was advocating a reasonable inference from the circumstantial evidence: defendant intended to sexually gratify himself by touching the boys' penises. The prosecution made a fair comment on the evidence. Each victim testified that defendant touched his penis inside his swimsuit. Further, each victim testified to experiencing skin-to-skin contact. The defense presented swim instructors who testified that they saw nothing unusual in the pool area, but they also testified that there is no reason to touch a child's genitals during a lesson and that touching a child underneath his swimsuit is inappropriate. Contrary to defendant's assertion, the prosecution was not misstating the law, which permits argument on such an inference. We conclude that the prosecution's comment about sexual gratification was not error and that therefore no plain error occurred.

¶ 39                          3. "Unreasonable doubt"

¶ 40    Third, defendant challenges the prosecution's statement, "We have to prove [defendant's guilt] beyond a reasonable doubt. However, it's not beyond all doubt. It's not beyond an

unreasonable doubt." Defendant again concedes that he did not object at trial or raise the issue in his posttrial motion. Defendant argues that the comment was plain error, but we disagree.

¶ 41 Defendant characterizes the remarks about "unreasonable doubt" as an improper attempt to define the reasonable doubt standard. Although the United States Constitution does not prohibit courts from defining reasonable doubt (*Victor v. Nebraska*, 511 U.S. 1, 5 (1994)), the Illinois Supreme Court has stated that "[t]he law in Illinois is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury" (*People v. Speight*, 153 Ill. 2d 365, 374 (1992) (citing *People v. Cagle*, 41 Ill. 2d 528, 536 (1969), and *People v. Malmenato*, 14 Ill. 2d 52, 61 (1958))).

¶ 42 "Reasonable doubt is a term which needs no elaboration and we have so frequently discussed the futility of attempting to define it that we might expect the practice to be discontinued." *Malmenato*, 14 Ill. 2d at 61. In *People v. Edwards*, 55 Ill. 2d 25, 35 (1973), our supreme court, although it found that the prosecution's attempt to explain reasonable doubt was not reversible error, advised that the "better practice" was "not to attempt to define the term 'reasonable doubt' either in *voir dire* or closing argument."

¶ 43 In *People v. Eddington*, 129 Ill. App. 3d 745, 781 (1984), the appellate court admonished the prosecution for remarks in closing argument that served to "de-emphasize the State's burden." The *Eddington* court relied upon other grounds for reversal of the defendant's conviction and did not hold that the closing comments were reversible error, but it also noted that the prosecution's attempt to describe the burden of proof was more objectionable than remarks generally found to be insufficiently prejudicial to warrant reversal of a conviction. *Eddington*, 129 Ill. App. 3d at 781. The court concluded: "We trust the prosecutor will not address the definition of reasonable doubt on retrial." *Eddington*, 129 Ill. App. 3d at 781.

¶ 44 As in *Eddington*, the prosecution's discussion of reasonable doubt in this case was more troubling than other comments found by Illinois courts to be insufficient to require reversal. In our view, the prosecution's stating that it need not present proof "beyond all doubt" or "beyond an unreasonable doubt" was an attempt to improperly define reasonable doubt by describing what it is not.

¶ 45 Although we have concluded that the State improperly defined reasonable doubt during rebuttal argument, we must also determine whether this error compels a new trial under the plain-error doctrine. Defendant contends that it does, both because the evidence is closely balanced and because the error denied him a fair trial. However, " '[i]mproper comment is plain error [only] when it is either so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten a deterioration of the judicial process.' " *People v. Euell*, 2012 IL App (2d) 101130, ¶ 21 (quoting *People v. Yonker*, 256 Ill. App. 3d 795, 798 (1993)). That standard is plainly inconsistent with the view that any misstatement of the burden of proof, to any extent, is plain error. *Euell*, 2012 IL App (2d) 101130, ¶ 21.

¶ 46 Moreover, when a defendant preserves for review a challenge to the prosecution's closing argument, we may affirm if we deem the comments harmless beyond a reasonable doubt, reversing only " 'where the improper remarks resulted in substantial prejudice to the defendant's right to a fair trial.' " *Euell*, 2012 IL App (2d) 101130, ¶ 22 (quoting *People v.*

*Edgecombe*, 317 Ill. App. 3d 615, 623 (2000)). If we do not automatically reverse in light of a preserved misstatement, certainly we may not automatically reverse in light of a forfeited one. *Euell*, 2012 IL App (2d) 101130, ¶ 22.

¶ 47 Before deliberations, the trial court gave the jury Illinois Pattern Jury Instructions, Criminal, Nos. 2.03 and 2.04 (4th ed. 2000), regarding (1) defendant's presumption of innocence, (2) the State's burden of proof, and (3) "[t]he fact that defendant did not testify must not be considered by [the jurors] in any way in arriving at your verdict." The jury was properly instructed on these matters such that the prosecution's brief, isolated comments about reasonable doubt were unlikely to mislead the jury. Although we do not condone the remarks, we conclude that the prosecution's comments would not have been reversible error if defendant had preserved the claim and that therefore no plain error occurred where defendant forfeited the issue. See *People v. Naylor*, 229 Ill. 2d 584, 602 (2008) ("Absent reversible error, there can be no plain error.").

¶ 48                                    B. Courtroom Closure

¶ 49 Defendant next contends that he was denied his right to a public trial when the trial court barred access to the courtroom before J.M. testified. The State argues that defendant has forfeited his claim. When the State moved before trial to close the courtroom during the minors' testimony, defense counsel objected to the closure, but counsel neither renewed the objection at trial nor raised the issue in a posttrial motion. Defendant concedes the forfeiture. However, we agree with defendant that we should review the claim for plain error, because the improper closure of a courtroom is a structural error that erodes the integrity of the judicial process and undermines the fairness of a trial. See *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (supreme court equates the second prong of plain-error review with structural error); see also *Piatkowski*, 225 Ill. 2d at 565 (plain error occurs where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence). Nevertheless, we conclude that, in the absence of evidence of exclusion of anyone seeking entry into the courtroom, defendant has failed to establish than an error occurred, and therefore, there is no plain error.

¶ 50 The sixth amendment to the United States Constitution guarantees a defendant the right to a public trial. U.S. Const., amend. VI. This guarantee is for the benefit of the accused and " 'is a safeguard against any attempt to employ the courts as instruments of persecution.' " *People v. Cooper*, 365 Ill. App. 3d 278, 281 (2006) (quoting *People v. Seyler*, 144 Ill. App. 3d 250, 252 (1986)); see also *Waller v. Georgia*, 467 U.S. 39, 46 (1984).

¶ 51 While all trials are presumed to be open, the right is not absolute. *Cooper*, 365 Ill. App. 3d at 281 (citing *Waller*, 467 U.S. at 45). "[T]he presumption of openness will yield only to an 'overriding interest' that is specifically articulated." *Cooper*, 365 Ill. App. 3d at 282 (quoting *People v. Taylor*, 244 Ill. App. 3d 460, 468 (1993)). " '[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to

support the closure.' " *Cooper*, 365 Ill. App. 3d at 282 (quoting *Waller*, 467 U.S. at 48).

¶ 52        Section 115-11 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) permits courtroom closure during the testimony of minors who are victims of certain sex crimes. Section 115-11 provides in relevant part that "[i]n a prosecution for a criminal offense defined in *** Section *** 12-16 of the 'Criminal Code of 1961', where the alleged victim of the offense is a minor under 18 years of age, the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media." 725 ILCS 5/115-11 (West 2010). Our supreme court has held that a courtroom closure is constitutional if the statutory requirements of section 115-11 are met. *People v. Falaster*, 173 Ill. 2d 220, 228 (1996).

¶ 53        Section 115-11 applied to the proceedings in this case because defendant was charged with aggravated criminal sexual abuse, a violation of section 12-16 of the Criminal Code of 1961 (720 ILCS 5/12-16 (West 2010)), and the victims of the offenses were under the age of 18. The State moved before trial to close the courtroom during the testimony of J.M. and M.O., arguing that closure would minimize the trauma the minor victims would suffer while testifying. The trial court reserved ruling until the first minor, J.M., testified. At that point, the judge sent out the jury and asked the spectators in the courtroom about their interest in the case. Without hearing any objection, the judge allowed an attorney representing the family of M.O., an attorney representing Centegra Health Bridge, M.O.'s father, a CAC representative, and an attorney unconnected to the case to remain. The judge did not direct any spectator to leave the courtroom.

¶ 54        The State requested that "movement be restricted just while the victim is on the stand so there's no distraction." The judge instructed the bailiff to close the door and deny entry to everyone while J.M. testified.

¶ 55        On appeal, defendant asserts that certain ambiguities in the record show that he was denied an open trial: (1) the record does not indicate whether any person attempted to enter the courtroom during J.M.'s testimony, (2) the record does not indicate whether or when the courtroom was reopened following J.M.'s testimony, and (3) the record does not indicate what procedure was followed when M.O. testified. If, as defendant implies, any spectator was ordered to leave the courtroom during or after J.M.'s testimony, defendant could have supplemented the record to establish these facts on appeal. In this court, defendant could have filed a bystander's report under Illinois Supreme Court Rule 323(c) (eff. Dec. 13, 2005) or an agreed statement of facts under Rule 323(d). We acknowledge the possibility that someone outside the courtroom might have been denied access, and we recognize that supplementing the record on that point under Rule 323 would be inappropriate because that aspect of the courtroom closure would have been outside the proceedings. However, by means of a bystander's report or an agreed statement of facts, defendant could have worked with the trial judge and the prosecution to create a record with additional detail about whether an existing spectator was ordered to leave the courtroom at any time. Defendant filed neither a bystander's report nor an agreed statement of facts. To the extent that this leaves us with an incomplete record on the issue, any doubts that arise from the incompleteness of the record will be resolved against defendant, the appellant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 56 According to the record before us, on the day the trial court closed the courtroom, J.M. was the first witness to testify following the closure and the last to testify that day. There is nothing in the record to indicate that anyone was actually denied access to the courtroom during J.M.'s testimony. On the next day, the trial court did not exclude any spectator from the courtroom or direct the bailiff to bar access. Besides the closure during J.M.'s testimony, defendant points to nothing in the record to suggest that the courtroom was closed or that spectators were excluded at any subsequent point in the trial, including during M.O.'s testimony. If the trial court barred access to the courtroom or excluded spectators during the testimony of M.O. or any other witness, one would expect to see it mentioned in the transcript. It appears from the record that the trial court barred access to the courtroom only during J.M.'s testimony.

¶ 57 We conclude that defendant has not shown that any closure prejudiced defendant's sixth amendment right to a public trial. Defendant has presented no evidence that anyone was excluded from the courtroom. The trial judge followed section 115-11 by interviewing the spectators to determine their interest in the case. Satisfied that each spectator had a direct interest or would not affect J.M.'s testimony, the trial court decided not to direct anyone to leave the courtroom. The trial judge then ordered the bailiff to bar entry to anyone who attempted to enter. Closing a public hearing like a trial should not be done lightly, and the proper course would have been to direct the bailiff to signal if anyone attempted to enter and then determine on a case-by-case basis whether the person should be permitted to enter. However, we hold that the trial court did not abuse its discretion in barring entry to the courtroom during J.M.'s testimony. *Falaster*, 173 Ill. 2d at 227 (section 115-11 " 'provides that the judge may use his discretion in connection with the exclusion of those persons who, in his opinion, are not directly interested in the case' " (quoting *People v. Holveck*, 141 Ill. 2d 84, 102-03 (1990))).

¶ 58 Our decision is supported by *United States v. Osborne*, 68 F.3d 94 (5th Cir. 1995). In *Osborne*, codefendants Osborne and Norris were convicted of aiding and abetting, kidnaping, and possession of a firearm during a violent crime. The primary evidence was the testimony of the defendants' friend and of the 12-year-old victim, Jane Doe. The prosecution asked the district court to close the proceedings during Jane's testimony, arguing that forcing Jane to testify in front of the public might traumatize or intimidate her. Over the defendants' objections, the court ordered Norris's sister, who was also Jane's aunt, to leave the courtroom. The court also prohibited any new spectators from entering during Jane's testimony. The court allowed the remaining audience, including relatives of both defendants, to stay. *Osborne*, 68 F.3d at 97.

¶ 59 The defendants appealed their convictions, arguing, *inter alia*, that the district court violated their constitutional right to a public trial when it closed the courtroom while Jane testified. The *Osborne* court affirmed the convictions, emphasizing that the district court only partially closed the courtroom, allowing all but one of the existing spectators to remain. The court held that "[t]he protection of a minor from emotional harm is a substantial enough reason to defend a limited closing of the proceedings." *Osborne*, 68 F.3d at 99.

¶ 60 The *Osborne* court found that the district court did not limit access to the proceedings beyond justifiable limits, noting that the district court refused the prosecution's request for

total closure of the proceedings. With one exception, the district court allowed all existing spectators to remain, and it prohibited access only to those who might have attempted to enter during Jane's testimony. *Osborne*, 68 F.3d at 99. First, there was no evidence that the district court's ruling caused anyone to be denied entry to the courtroom. Second, the one person asked to leave the proceedings was both Norris's sister and Jane's aunt, whose presence might have traumatized Jane. Third, other members of the defendants' families were allowed to remain. *Osborne*, 68 F.3d at 99. Emphasizing that courts should not lightly close public proceedings and should develop a detailed record when they do, the *Osborne* court held that, under the circumstances, the defendants were not denied their sixth amendment right to a public trial. *Osborne*, 68 F.3d at 99.

¶ 61    This case is similar to *Osborne*. In this case, protecting J.M. from emotional harm was an overriding interest in ordering a limited closing of the proceedings, and the trial judge narrowly tailored the closure to afford defendant as public a trial as possible. More importantly, the trial judge ordered no existing spectator to leave, and defendant has presented no evidence that the court's ruling caused anyone to be denied access to the courtroom. If no person sought to enter the courtroom during defendant's trial, the court's order never took effect. Thus, defendant has failed to establish that the trial court's order actually resulted in error in that a person otherwise entitled to enter the courtroom was denied access.

¶ 62                                    C. Presentence Credit

¶ 63    Finally, defendant argues that he is entitled to a $5 *per diem* credit, totaling $45, toward his $2,500 fine. Section 110-14 of the Code of Criminal Procedure provides that "[a]ny person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction *** shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." 725 ILCS 5/110-14 (West 2010). On appeal, a defendant may be awarded a *per diem* credit pursuant to section 110-14 for incarceration before sentencing, even if the defendant failed to apply for it in the trial court. *People v. Woodard*, 175 Ill. 2d 435, 457-58 (1997). The State concedes that defendant is entitled to a $45 credit, and the record supports the concession. We modify the court's sentence to show that defendant is entitled to a $45 credit for his nine days of presentence incarceration.

¶ 64                                        CONCLUSION

¶ 65    For the preceding reasons, the judgment of the circuit court of McHenry County is affirmed as modified.

¶ 66    Affirmed as modified.